# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING


FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2017 JUL 31 PM 4: 49
STEPHAN HARRIS, CLERK
CHEYENNE

BIODIVERSITY CONSERVATION ALLIANCE,

      Petitioner,

      v.

DAN JIRON in his official capacity as Deputy Under Secretary for Natural Resources and Environment, UNITED STATES DEPARTMENT OF AGRICULTURE; and THOMAS TIDWELL in his official capacity as Chief of the UNITED STATES FOREST SERVICE, an agency of the United States,

      Respondents,

      and

STATE OF WYOMING; WYOMING WILD SHEEP FOUNDATION; WYOMING WOOL GROWERS ASSOCIATION; LADDER LIVESTOCK COMPANY, LLC; BANJO SHEEP COMPANY, LLC; and WYOMING SPORTSMEN FOR FISH AND WILDLIFE,

      Intervenors.

Case No. 12-CV-73-ABJ

---

## OPINION AND ORDER

---

This matter is before the Court on Biodiversity Conservation Alliance ("Petitioner"'s) *Amended Petition for Judicial Review* (ECF No. 17). The Court will describe the relevant statutes and regulations involved in this case, summarize the factual and procedural background of the case, address the issue of standing, present the standard of review, and then turn to the analysis. After reviewing the parties' submissions, the applicable law, the administrative record, and being fully advised of the matter, the Court finds as follows.

## RELEVANT STATUTES AND REGULATIONS

### a. *National Forest Management Act*

The Forest Service, an agency within United States Department of Agriculture[1], manages the national forest system. The National Forest Management Act requires the Forest Service to manage forests using a two-step process. *See* 16 U.S.C. §§ 1600–1614. First, the Forest Service must develop a Land and Resource Management Plan ("forest plan") for each national forest unit. Second, it must implement the forest plan through site-specific projects. 16 U.S.C. § 1604(a).

Forest plans must "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area...." 16 U.S.C. § 1604(g)(3)(B). Implementing regulations provide standards and guidelines to create a forest plan and approve any accompanying site-specific projects. *See* 16 U.S.C. § 1604(g).

---

[1] The Court elected not to use acronyms in this order, although they are extremely common in environmental administrative law cases.

National Forest Management Act regulations have been amended numerous times. Two such amendments are the 1982 amendment (the "1982 Rule") and the 2005 amendment. *See* 47 Fed.Reg. 43,026 (Sept. 30, 1982) (codified at 36 C.F.R. §§ 219.1–219.29 (1982)); 70 Fed.Reg. 1023 (Jan. 5, 2005) (codified at 36 C.F.R. §§ 219.1–219.16 (2005)).

**b.** *The 1982 Rule*

The 1982 Rule required the Forest Service to promote the diversity of species by maintaining "viable populations of existing native and desired" plants and animals. 36 C.F.R. § 219.19 (1982). This "viability mandate" required that each species' population and habitat be abundant and well-distributed enough to safeguard its continued existence. *See id.* How to interpret §219.19's viability mandate is at issue here. *See Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1049 (10th Cir. 2014). To accomplish the regulation's viability provision, the Forest Service has set an objective to "[m]aintain viable populations of all native and desired nonnative wildlife, fish, and plant species in habitats distributed throughout their geographic range on National Forest System lands." *Forest Serv. Manual,* Ch. 2670.22(2).

The 1982 forest planning regulations were superseded in 2000, when new regulations were promulgated. However, "[t]he 2000 planning rules were not immediately promulgated. Instead, the new regulations contained transition provisions which provided that, beginning on November 9, 2000, until the promulgation of the new, final rule, the Forest Service should consider 'the best available science in implementing a forest plan.' " *Utah Envt'l Cong. v. Bosworth,*443 F.3d 732, 737 (10th Cir.2006)

(footnote and citation omitted). The Tenth Circuit has "since held that 'site-specific project decisions made from November 9, 2000 to January 5, 2005, that implemented pre-November 9, 2000 forest plans, were to be made only under the 'best available science' standard.' " *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821–22 (10th Cir. 2008) (quoting *Utah Envt'l Cong. v. Richmond,* 483 F.3d 1127, 1132 (10th Cir.2007)).

## FACTUAL BACKGROUND

The Medicine Bow National Forest is located in southeast Wyoming. It contains three mountain ranges: the Laramie Range, the Snowy Range, and the Sierra Madre Range. AR-2923. Bighorn sheep occupied all three mountain ranges until extirpation sometime before the 1900s. *Id.* at 1163, 4932, 4943. In the 1960s, 1970s, and 1980s, bighorn sheep were reintroduced into the three mountain ranges. *Id.* at 4839–41, 4932, 4943. Between 1980 and 2000, the total bighorn sheep population in Medicine Bow National Forest was between 400 and 450 individuals; below the objective of 1,050. *Id.* at 3516. The population distribution among these mountain ranges has varied over the years.

The Laramie Peak herd, occupying the Laramie Range, contained 207 bighorn sheep in the mid-1980s and 300 in 2005. *Id.* at 3516, 4841. The Laramie Peak herd has a population objective of 500. *Id.* at 3516. The Douglas Creek herd, in the Snowy Range, contained 143 bighorn sheep in the mid-1980s and 100 in 2005. *Id.* at 3516, 4839. The population objective for the Douglas Creek herd is 350. *Id.* at 3516, 4839. The

Encampment River herd, occupying the Sierra Madre Range, contained 50 bighorn sheep from 1980 to 2005. *Id.* at 3516, 4028. The National Forest Service gave no population objective for the Encampment River herd in its Final Environmental Impact Statement. *Id.* at 3516.

One of the primary threats to bighorn sheep is domestic sheep. *Id.* at 3516, 4026, 4869–72. Domestic sheep carry a pneumonia-like disease called *Pasteurella-haemolytica* that bighorn sheep contract by coming into contact with domestic sheep. *Id.* The infected bighorn sheep can then return to the herd and spread the disease. *Id.* at 3516, 4026, 4027. After the herd contracts the disease, it experiences mortality of 75% to 100%, with any remaining survivors not reproducing for several years. *Id.* at 4027. The National Forest Service recognizes this issue and attempts to prevent bighorn sheep death on public land by limiting domestic sheep grazing allotments to specific areas away from bighorn sheep populations. *Id.* at 3516, 4027, 4867. This was the approach taken in the Medicine Bow National Forest 2003 Revised Land and Resource Management Plan, for two of the three bighorn sheep herds. *Id.* at 1572, 1577, 2439, 2904, 4024, 4306, 5257–58.

The National Forest Service manages the Medicine Bow National Forest pursuant to its forest plan, as required under the National Forest Management Act. 16 U.S.C. § 1604. The National Forest Service developed the Medicine Bow National Forest Plan pursuant to the 1982 implementing regulations for the National Forest Management Act, currently located as amended at 36 C.F.R. 219. AR-33. The original Medicine Bow National Forest Land and Resource Management Plan was approved on November 20, 1985. *Id.* at 38. Since that time, the plan has been amended eighteen times. *Id.*

In December of 1992, the current legal process began. *Id.* That year, the National Forest Service began revising its 1985 forest plan. *Id.* In 1995, the Medicine Bow National Forest was administratively combined with the Routt National Forest, which is located in north central Colorado.[2] *Id.* The National Forest Service elected to first revise the forest plan for the Routt National Forest before addressing the forest plan for Medicine Bow National Forest. *Id.*

The National Forest Service approved its revision of the forest plan for the Routt National Forest in 1998 and subsequently published its Notice of Intent to Revise the Medicine Bow Forest plan in the Federal Register in 1999. *Id.* After doing so, the National Forest Service spent time considering and developing alternatives and analyzing the probable environmental consequences stemming from those alternatives. *Id.* Its considerations were documented in the Draft Environmental Impact Statement, which was published to the public in December of 2002. *Id.* A paragraph in the Draft Environmental Impact Statement sums up the National Forest Service's view on the Encampment River herd after cooperation with the State of Wyoming.

> In general, management efforts for bighorns consist of attempting to prevent contact between the two, largely by creating distances (buffer zones) between bighorn sheep ranges and domestic sheep grazing allotments. . . .
>
> Wyoming Game and Fish is currently finalizing a state-wide comprehensive management plan for all bighorn herds in the state. . . .

[2] The Court notes that the Medicine Bow National Forest has been managed in conjunction with the Thunder Basin National Grassland from the beginning of its existence in 1985 until around 1995 when the grassland planning was shifted to the Northern Great Plains Management Plans Revision Effort. *Id.* The Thunder Basin National Grassland, located in northeastern Wyoming, is not at issue in this case.

> [T]he plan assigns a priority for management for each of the herds in the state, with Priority 1 being most important and Priority 3 being least important[.] Management actions for Priority 1 herds include resolving conflicts with domestic sheep, allocating funds for habitat manipulation, and transplanting additional numbers. These management plans won't be utilized for Priority 3 herds; in addition, herds may not be considered viable.
>
> The Encampment River herd is considered a Priority 3 herd. It is basically considered expendable by the state. No habitat work or funding will be expended, and no transplant numbers will be added. The herd remained about steady at 50 animals for about 25 years, despite the fact that both the summer and winter bighorn range is surrounded by and overlapped with all or parts of 7 sheep allotments. In addition, domestic sheep operations occur on surrounding private lands as well.

*Id.* at 2198. The National Forest Service received public comments on the Draft Environmental Impact Statement.

Based on public comments, the National Forest Service modified its Draft Environmental Impact Statement and published its Revised Land and Resource Management Plan, Final Environmental Impact Statement, and Record of Decision in 2003. *Id.* at 2439–4365. Biodiversity Conservation Alliance contributed public comments to the Draft Environmental Impact Statement and appealed the Revised Land and Resource Management Plan, Final Environmental Impact Statement, and Record of Decision. *Id.* at 1163–64, 1536–39. Biodiversity commented and appealed for various reasons, but the one before this Court is whether emphasizing domestic sheep over the Encampment River bighorn sheep herd was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The Revised Land and Resource Management Plan discusses various aspects of the Forest Service's plan, including specifically, the Encampment River Geographic

Area. *Id.* at 2642–46. In a section of the Revised Land and Resource Management Plan, addressing management in the Snowy Range Mountains, the Forest Service lists a standard to be followed: "[m]anage domestic sheep to provide adequate and effective separation from bighorn sheep, avoiding direct contact between the two." *Id.* at 2663.

The Final Environmental Impact Statement restates some of the same material on bighorns, but with a few adjustments. *Id.* at 3516–17. As to the two Priority 3 herds, it states as follows.

> The Encampment River herd is considered a Priority 3 herd. No habitat work or funding will be expended, and no transplant numbers will be added. The herd, reintroduced almost a quarter century ago, has remained steady at 50 animals for about 25 years, despite the fact that both the summer and winter bighorn range is surrounded by and overlapped with all or parts of 7 sheep allotments. In addition, domestic sheep operations occur on surrounding private lands as well.

> The Douglas Creek herd on the west side of the Snowy Range, with an established objective of 350 animals, has shown a slow, mostly-steady decrease from 143 animals in the mid-1980s to about 100 today. The animals were also reintroduced into the area about 25 years ago. The Douglas Creek herd is also considered a Priority 3 herd. All 8 domestic sheep allotments on the Snowy Range are currently vacant (the last ones were used in 1997). There is some domestic sheep use of the Forest and adjacent to crucial range along the North Platte corridor. There are occasional sighting reports of individual bighorn rams on the Medicine Bow Peak area of the Snowies, but there are generally poor opportunities for animals to move to higher elevations because of dense timber stands. Wyoming Game and Fish Department reports mention that habitat improvement would entail the cutting or burning corridor routes if the bighorn sheep are able to move outside the current limited range; they also state additional burning is needed on winter range in the Douglas Creek and Bennett Peak areas.

*Id.* The Encampment herd received little to no discussion on managing the herd for success. *Id.*

Appendix D to the Revised Land and Resource Management Plan Final Environmental Impact Statement contains a more extensive discussion of the bighorn. *Id.* at 4017–29. In the appendix, the bighorn is one of two mammals that are species of local concern. *Id.* at 4017. Bighorn sheep receive a rating of G4, S3/S4, meaning that they are "apparently secure globally, though [they] might be quite rare in parts of its range, especially at the periphery" and "rare in state." *Id.* at 4017, 4019–20. The appendix mentions that bighorn sheep, or *ovis canadensis*, occur in the mountains in southern Canada, the western United States, and northern Mexico. *Id.* at 4022. It discusses the three herds in the Medicine Bow National Forest.

There are three herds on the [Medicine Bow National Forest].

**The Laramie Peak** herd occupies "adequate habitat" in the southern portions of the Laramie Peak Unit, but the habitat in the northern portions of the herd unit is marginal (WGFD, letter 10/28/2002 attachment). All Forest Service grazing allotments are now occupied by cattle except one occupied by domestic sheep at the northwestern end of the unit. This allotment is about 5 miles from a mapped bighorn home range (off-forest, based on WYGF data); though the area used by the domestic sheep is primarily out on the plains where bighorns are unlikely to occur, there is a chance that a young ram would move that far. There is no restriction on grazing by sheep on the allotments now occupied by cattle, though the effects on bighorns would be assessed if a change to sheep use were proposed. The Forest Service ownership is fragmented and interspersed with private land. There is nothing to prevent use by sheep on that land, though currently only a few small "hobby" herds are present. These small herds tend to be confined, but could be visited by bighorn rams wandering during breeding season.

**The Douglas Creek** herd (in the SE Medicine Bow Mountains) occupies the rocky area and canyons that lie in and north of the N. Platte Wilderness. In summer, bighorns may be seen at the top of the Medicine Bow range, along Highway 130. Both rams and ewes have been seen in this area, which is probably part of the historic summer range for the species. The recent lack of large burns has left dense forest that reduces connectivity between

this high elevation summer range and the lower wintering grounds. There are eight grazing allotments in the Medicine Bow range, running from the tundra (where bighorns have been seen) to the northeast. The high-elevation allotments are currently vacant (though recent queries have been made about use for sheep.) The other allotments on the Medicine Bow Range are either vacant or used by cattle, but there is no restriction on use by domestic sheep. Use of these allotments as a grass bank for sheep has been discussed.

**The Encampment River** herd has not flourished, though the reason for this is not clear. Though the herd's summer range overlaps several active grazing allotments occupied by sheep and Chlamydia has been found in the herd (Loose 2002), (Cook, Irwin Larry L et al. 1998). *Pasteurella haemolytica* has not been documented. However, the overall condition in the herd is poor; there is evidence that poor quality forage may be a contributing factor (Loose 2002), (Cook, Irwin Larry L et al. 1998). The Wyoming Interagency Bighorn Working Group ranks this herd as lowest priority (of 3 classes) for investment in habitat improvement.

*Id.* at 4023. The first two paragraphs discuss cattle grazing, while the third does not. The first two paragraphs do not discuss the herd priority number, while the third paragraph does. In addition, the second paragraph does not discuss the perils of the Douglas Creek Priority 3 herd, but it does discuss grass banking as another alternative to sheep grazing. And paragraph three does not discuss why forage quality is poor and whether domestic sheep grazing contributed to the poor quality.

Appendix D states that "[m]aintenance of all three herds across the current range on the Forest is unlikely under current direction." *Id.* at 4026. The National Forest Service noted that its "responsibility to maintain viable populations does not mean that populations must be maintained at 100% of potential; rather there is a balance between this requirement and other multiple use objectives." *Id.* at 4027. It discussed its multiple-use objective of promoting domestic sheep grazing. *Id.* The National Forest Service stated that it was taking a one-or-the-other approach: choosing domestic sheep grazing in

some areas and choosing bighorn sheep habitat in others. *Id.* The National Forest Service's explanation for choosing domestic sheep over bighorn sheep in the Sierra Madre Range reads as follows.

> The Sierra Madre was chosen as the range in which domestic sheep grazing is emphasized in Alternatives B through E because:
> - The bighorn herd there (the Encampment River herd) is classified as lowest priority (Level 3) at the state level (the Bighorn Working Group). State Game and Fish biologists have ranked the herd third of the three herds on the MBNF because it has done poorly over the years.
> - There are 7 active domestic sheep allotments in the Sierra Madre (compared to none in the Snowy Range).
> - There are active domestic sheep allotments in the mountains to the south of the Sierra Madre on the adjoining Routt National Forest, but not south of the Snowy Range.
> - The Encampment River herd's population (in the Sierra Madre) is the lowest of the three herds on the Forest (around 50), is well below the genetically viable limit (of 125), and has not shown increases over the years.

> The Encampment River herd will still be managed to maintain ungulate habitat, mostly winter forage (by prescribed burns in the Encampment GA), though the WDGF will put its efforts and funding into improvement of habitat for higher priority herds.

*Id.* The Appendix concludes with Table D-47, after the statement "the evaluation criterion for bighorn sheep is separation from domestic sheep." *Id.* at 4028–29. It is clear from the table that Alternative F allows the most widespread survival for the bighorn, while the chosen Alternative D results in "likely loss of the Encampment herd." *Id.* at 4028.

Biodiversity first appealed the Final Environmental Impact Statement and Record of Decision to the Chief of the Forest Service for review. *Id.* at 33. This appeal was consolidated with many other appeals, and the Chief upheld most of the Revised National

Forest Plan. *Id.* at 33–99. However, among other issues, Biodiversity prevailed on the bighorn sheep issue, which the Chief stated was because the plan did not properly address the viability of the Encampment River herd. *Id.* at 47–48, 58–61. The Chief focused on Appendix D to the Final Environmental Impact Statement, which stated "[t]he Forest Service's responsibility to maintain viable populations does not mean that populations must be maintained by 100% of potential; rather there is a balance between this requirement and other multiple use objectives." *Id.* at 60. The Chief found this statement to be an inaccurate characterization of the law.

> This interpretation is inaccurate for several reasons. The bighorn population on the Medicine Bow NF is currently well below 100 percent of State Herd Management Objectives (currently at approximately 40 percent of State population objectives, FEIS, p. 3-524). More importantly, the NFMA viability requirement stipulates that viable populations be well distributed across the planning area. Although it is permissible to allow sheep populations to exist at levels below the projected maximum (as is currently the case), allowing the extirpation of one or more of the three bighorn herds that currently exist on the Medicine Bow NF does not comply with the requirement at 36 CFR 219.19 to ensure the species continued existence is well distributed in the planning area. While it is true that two of the three Medicine Bow NF bighorn herds were assigned low priority ratings by the State Game and Fish Department (FEIS, p. 3-524), nowhere in the record or in State Game and Fish Department documents is there an indication that "low priority" is synonymous with "expendable." Furthermore, there are many ways to maintain the current level of domestic livestock grazing on the forest (e.g. meeting multiple-use objectives) without causing an adverse impact on the Medicine Bow NF bighorn sheep herds.

*Id.* at 60–61. The Chief went on to mention that "[t]he Record does not adequately explain why the [National Forest Service] chose not to incorporate standards into the [Revised Land and Resources Management Plan] that would increase the likelihood of

long-term persistence of the Encampment herd." *Id.* at 61. The Chief's decision on the bighorn viability issue reads as follows.

> Issues are raised in the Medicine Bow NF FEIS about the viability of bighorn sheep populations well distributed on National Forest System lands. This is largely due to the decision to emphasize domestic livestock (sheep) grazing over bighorn sheep in the Sierra Madres.

> Compliance with the viability requirements of 36 CFR 219.19 dictates that the Medicine Bow NF be managed with the objective of maintaining all three bighorn sheep herds. However, the only management directive in the LRMP specifically addressing management of bighorn sheep in the Sierra Madres is a guideline pertaining to vegetation management. Not all of the factors threatening these herds are within the control of the Forest Service, yet reasonable attempts should be made to manage those factors that can be influenced. This could include making adjustments to existing sheep allotments within and adjacent to the range of bighorn herds to maintain the separation of domestic and bighorn sheep to the extent possible.

> The Regional Forester is instructed to assure that ongoing sheep management is aimed at maintaining the Laramie, Douglas Creek, and Encampment bighorn herds and is supported by appropriate management direction in the LRMP, amending the LRMP as necessary. The Medicine Bow NF should refer to the Final Report and Recommendations from the Wyoming State-wide Bighorn/Domestic Sheep Interaction Working Group, issued subsequent to the LRMP, and appropriately consider the report recommendations in implementing administrative actions and adjusting management direction. During this process, the Forest shall consult with affected State agencies, as well as Regional range and wildlife program managers.

*Id.*

After the Chief's reversal on this issue, the Wyoming Game and Fish Department and Wyoming Department of Agriculture requested discretionary review by the Deputy Under Secretary for the Natural Resources and Environment in the United States Department of Agriculture. *Id.* at 101–104. They requested review for four reasons: the plan meets the goals and recommendations of the Wyoming State-wide

Bighorn/Domestic Sheep Working Group Final Report and Recommendations; the introduction of bighorn sheep into the Sierra Madres was not intended to stop domestic sheep grazing in that area; the viability mandate allows the Forest Service to maintain viability with two of the three bighorn sheep herds, while favoring domestic sheep as to the Encampment River herd; and a decision removing domestic sheep grazing would conflict with state authority and cause distrust of the federal authorities. *Id.* at 101. Wyoming agencies discussed each reason more thoroughly, and then concluded their request for review. *Id.* at 102–104.

The Deputy Under Secretary accepted the Wyoming agency's request for discretionary review and issued his decision, upholding most of the Chief's reversal of the forest plan except for the portion of the plan dealing with bighorn sheep viability.[3] *Id.* at 105–110. The Deputy Under Secretary disagreed with the Chief's interpretation of viability, stating that not all three herds need to be maintained for the National Forest Service to meet its viability requirement. *Id.* at 108–109. The Deputy Under Secretary reasoned that such a viability definition would create a disincentive to experiment with further reintroductions. *Id.* at 109. He stated that the multiple-use objectives would be violated by this application of viability. *Id.* He pointed out that the courts have not concretely defined diversity, so this was a reasonable interpretation of the term. *Id.* He noted that various biologists and planners believed the viability requirement meant that all three herds must be preserved. *Id.*

_____

[3] The Court notes that the State of Wyoming's United States Congressional Delegation urged the Deputy Under Secretary to review and reverse the Chief's decision on bighorn sheep. *Id.* at 5252–56.

The Deputy Under Secretary stated that the Chief mistakenly interpreted viability and, because of that misunderstanding, the Chief did not properly analyze whether the Final Environmental Impact Statement failed to explain the issue. *Id.* The Deputy Under Secretary found that the Final Environmental Impact Statement had "a clear description of the tradeoffs that the Regional Forester considered in deciding to emphasize maintenance of two herd of bighorn sheep rather than three." *Id.* The Deputy Under Secretary concluded that "the threat of disease means that bighorn and domestic sheep are unlikely to coexist; management must emphasize one or the other." *Id.* The Deputy Under Secretary set aside the Chief's reversal of this portion of the forest plan. *Id.*

## PROCEDURAL BACKGROUND

Petitioner Biodiversity Conservation Alliance has challenged the decision of the Deputy Under Secretary of Agriculture upholding the Medicine Bow National Forest Revised Forest Plan with regard to the issue of bighorn sheep viability. (ECF No. 22 at 7). Petitioner alleges that Respondents United States Department of Agriculture Natural Resources and Environment violated the National Forest Management Act when they overturned the Chief of the United States Forest Service. *Id.*

The Court granted leave to the State of Wyoming to intervene on June 28, 2012. ECF No. 15. The Court also granted leave to Wyoming Wild Sheep Foundation, Wyoming Wool Growers Association, Ladder Livestock Company, LLC, Banjo Sheep Company, LLC, Wyoming Sportsmen for Fish and Wildlife intervention on August 17, 2012. ECF No. 20.

Respondents lodged the Administrative Record with the Court August 31, 2012. ECF No. 21. Petitioners then soon filed their *Opening Brief in Support of Amended Petition for Judicial Review,* ECF No. 22. Respondents filed *Federal Respondents' Brief in Opposition to Petitioner's Opening Brief,* ECF No. 27, while the intervening parties responded with *Joint Response Brief of Respondent-Intervenors,* ECF No. 26. Petitioners then filed their *Reply Brief in Support of Amended Petition for Judicial Review,* ECF No. 30. After the Court granted Wyoming County Commissioners' Association leave to participate as Amicus Curiae, ECF No. 29, they filed their *Brief of Amicus Curiae in Opposition to Petition for Judicial of Agency,* ECF No. 31.

After the Court reviewed all parties' briefs and the administrative record, the Court issued an *Order Requesting Supplemental Briefing on the Issue of Standing,* ECF No. 38, to determine whether petitioners had Article III standing. Once all supplemental briefing and responses were concluded, the Court took all issues under advisement.

## STANDING

As a preliminary matter the Court must address whether or not Petitioner, Biodiversity Conservation Alliance, has standing to challenge this agency action. The Court's request for supplemental briefing on standing focused on the decision in *Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013). The Court will look at standing as a whole.

To begin with, Biodiversity is an association which must assert the interests of its members in order to be granted standing. *See Sierra Club v. Morton,* 405 U.S. 727 (1972).

[A]n association has standing to bring suit on behalf of its members when:
(a) its members would otherwise have standing to sue in their own right; (b)
the interests it seeks to protect are germane to the organization's purpose;
and (c) neither the claim nor the relief requested requires the participation
of individual members in the lawsuit.

*Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The Court will first address the second and third prongs of associational standing.

Through this lawsuit, Biodiversity seeks to protect an interest that is germane to the organization's purpose. Biodiversity is "a non-profit organization" with a "mission to protect wildlife and wild places in Wyoming and surrounding states, particularly on public lands." (ECF No. 23, p. 2). Neither the claim nor the relief requested requires the participation of individual members in the lawsuit. The respondents and intervenors do not contest this.

The Court will now address the issue of whether a Biodiversity member "would otherwise have standing to sue in their own right." *Hunt,* at 343. The Court notes that the United States Supreme Court makes clear petitioner, Biodiversity, bears the burden of showing that is has standing. *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009).

To establish the constitutional minimum of standing petitioner must allege "(1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 34 (D.D.C. 2015) (citations omitted); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561

(1992). With this legal framework, the Court looks to the facts to see if Biodiversity has met its burden.

The Court begins with the *Declaration of Erik Molvar.* ECF No. 23. *See US Magnesium, LLC v. U.S. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012) (indicating that supplemental filings like the *Declaration of Erik Molvar* is not only proper, but crucial).

First, Mr. Molvar must have suffered an injury in fact. Generalized harm to the environment cannot be a concrete and particularized injury. *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009) citing *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972). But harm affecting the recreational or aesthetic interest of the petitioner will suffice. *Id.* In fact, "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purpose of standing." *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1196, 1206 (10th Cir. 2014) (*quoting Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010)).

Mr. Molvar is the executive director for and a member of Biodiversity. ECF No. 23, p. 2. He is a wildlife biologist who has visited the Sierra Madre range on many occasions, including many areas frequented by the Encampment River herd. *Id.* at 2–3. In 1999, he hiked the Encampment River Trail, Green Mountain Trail, and Continental Divide Trail, documenting his travels in the book *Wild Wyoming*. *Id.* at 3–4. In *Wild Wyoming*, Mr. Molvar discussed the importance of bighorn sheep to recreational experiences. *Id.* at 4. He returns to this area more than once a year, often with his children. *Id.* He enjoys many forms of recreation in this area, and the bighorn sheep

18

enhance his experience. *Id.* Mr. Molvar plans to continue to visit the Sierra Madres and the Encampment River herd in the years to come. *Id.* The Court finds Mr. Molvar has a concrete and particularized interest.

Actual or imminent, not conjectural or hypothetical is the next element of injury in fact. The actual and imminent injury is the high risk of loss of the Encampment River herd.

In *Clapper*, the Supreme Court of the United States defined imminent as "certainly impending." *Clapper*, 133 S. Ct. at 1147, 1155. In this case, the evidence of a certainly impending future injury is throughout the record and emphasized by the National Forest Service's own practices and science. The mortality rate for bighorn sheep that contact domestic sheep is 75%–100%, with the surviving females not reproducing for several years. The National Forest Service and the State of Wyoming found the Encampment River herd "expendable" and have stopped investing time or money into the herd. The Court finds the injury to be actual and imminent, not conjectural or hypothetical.[4]

Second, there must be a causal connection between the injury and the conduct complained of. The injury has to be fairly traceable to the challenged action and not the result of the independent action of some third party not before the court. Here, there is no dispute on this issue. The National Forest Service issues grazing allotments pursuant to its Revised Land and Resource Management Plan. The National Forest Service has continued to issue and renew the seven domestic sheep allotments directly within and

---

[4] Additionally, even if *Clapper*'s definition of imminent equated to no standing under these facts, *Clapper* is clearly distinguishable as a case involving national security interests and future, hypothetical injury.

around the Encampment River herd range. Domestic sheep are the primary indicator species for bighorn sheep, because death is likely caused by contact with domestic sheep. The National Forest Service's creation of the Revised Land and Resource Management Plan and the Deputy Under Secretary's upholding of the Revised Plan caused domestic sheep grazing to continue in the area. The Court finds there is a clear causal connection.

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. A favorable decision by this Court would reverse and/or remand the Deputy Under Secretary's decision and possibly reinstate the Chief's decision reversing the bighorn sheep portion of the plan. This in turn would cause the National Forest Service to revisit its Revised Plan to manage for maintenance and success of the Encampment River herd by better exploring its options and amend as it deems necessary on remand. This could include considering cattle grazing, grass banking, and exploring other areas for sheep grazing that still allows the domestic sheep industry to meet its goal of no net loss of grazing allotments. Grazing cattle in the area would promote livestock grazing and the multiple use initiative without sacrificing the viability of the bighorn sheep. Grass banking agreements with other nearby land owners that are far enough from bighorn habitat could allow the domestic sheep industry to access local forage without placing domestic sheep directly in bighorn habitat. The National Forest Service could explore other domestic sheep grazing areas and attempt to move the seven allotments so they are farther away from bighorn sheep. By considering these options and proactively protecting the Encampment River herd, the injury would be redressed. The Court finds Mr. Molvar, a member of Biodiversity, possesses standing to sue.

Since Biodiversity has met its burden of showing that it has standing for the type of relief sought, the Court will proceed with the standard of review followed by addressing the merits of the case.

## STANDARD OF REVIEW

Because the National Forest Management Act does not provide a private right of action, the Court must review the Deputy Under Secretary's decision approving the Medicine Bow Revised Land and Resource Management Plan as a final agency action under the Administrative Procedure Act. *Utah Envt. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). Under the Administrative Procedure Act, any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under § 706(2), the Court must set aside the agency action if it is:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence . . . ; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Id.* § 706(2); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414 (1971).

Here, Biodiversity relies on §706(2)(A) by arguing the respondents' action was arbitrary and capricious.

> An agency's action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Bosworth,* 443 F.3d at 739 (*quoting Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). In order to be upheld by a federal district court, an administrative agency determination must be supported by "substantial evidence" found in the administrative record as a whole. *See Olenhouse,* 42 F.3d at 1575. The Court's inquiry must be thorough, yet afford the agency a presumption of regularity. *Utah Envt. Cong. v. Richmond,* 483 F.3d 1127, 1134 (10th Cir. 2007). The deference given to an agency is "especially strong where the challenged decision[] involve[s] technical or scientific matters within the agency's area of expertise." *Bosworth,* 443 F.3d at 739 citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (1989).

When reviewing an agency's interpretation of its own regulations, the Court must uphold the interpretation, unless the agency's interpretation is "plainly erroneous or inconsistent with the regulation." *Christopher v. SmithKline Beecham Corp.,* 132 S.Ct. 2156, 2166 (2012) citing *Auer v. Robbins,* 519 U.S. 452 (1997). The Court must afford *Auer* deference to the interpretation as long as it is a reasonable interpretation of that regulation. *See Utah Envt. Cong. v. Troyer,* 479 F.3d 1269, 1281 (10th Cir. 2007) (rejecting *Auer* deference when the agency's interpretation is unreasonable); *see also*

*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014). However, an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view. *Watt v. Alaska,* 451 U.S. 259, 273 (1981); *see also General Electric Co. v. Gilbert,* 429 U.S. 125, 143 (1976).


## DISCUSSION

The Court must start with the statute that governs in this case: the National Forest Management Act. The National Forest Management Act directs the National Forest Service to issue regulations to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). Pursuant to this authority, the National Forest Service promulgated the following regulation in 1982.

> Fish and wildlife habitat shall be managed to maintain *viable populations* of existing native and desired non-native vertebrate species in the *planning area*. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. §219.19 (emphasis added)[5].

---

[5] The Court notes that the viability requirement has been superseded since the onset of this lawsuit. The Court is analyzing the regulation that was before the agency at the time of the decision and thus part of the administrative record. The superseded regulation was not incorporated into the relevant Forest Plan. *See*

Through approval of the Revised Plan and Deputy Under Secretary's upholding of the Revised Plan as to the Encampment River herd, Respondents, the Forest Service and the Department of Agriculture, made the determination to emphasize domestic sheep over the Encampment River herd in the Sierra Madre range, which would, Federal Respondents argue, still maintain the viability of the species in the planning area through the remaining two herds on the Laramie and Snowy ranges. Petitioner claims the Deputy Under Secretary's decision fails to comply with §219.19's viability mandate.

## I. Whether the regulation has a plain meaning or is ambiguous

Biodiversity and the Forest Service disagree about how to interpret the applicable regulation regarding species viability. The Court must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997). If the meaning is plain, it controls. *Id.* If the meaning is ambiguous, we defer "to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief," *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 155 (2012). When reviewing an agency's interpretation of its own regulations, the Court must uphold the interpretation, unless the agency's interpretation is "plainly erroneous or inconsistent

---

*City & Cty. of Denver, By & Through Bd. of Water Comm'rs v. Bergland,* 695 F.2d 465, 481 (10th Cir. 1982); *see also In re Big Thorne Project,* 857 F.3d 968, 974 n.3 (9th Cir. 2017); *Ecology Ctr.* v. *Castaneda*, 574 F.3d 652, 657 (9th Cir. 2009).

with the regulation." *Id.* citing *Auer v. Robbins*, 519 U.S. 452 (1997). The Court must afford *Auer* deference to the interpretation as long as it is a reasonable interpretation of that regulation. *See Utah Environmental Congress*, 479 F.3d at 1281 (10th Cir. 2007) (rejecting *Auer* deference when the agency's interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.") quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993). In other words, the Court must "accord *Auer* deference to the [Agency's] interpretation" when the Court determines it "is a reasonable interpretation of its own regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 601 (2013). "[A]n agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." *Id.*

The Court must first determine whether §219.19 plainly states that all potential wildlife habitat across the planning area must be managed to support the viability of native and desired non-native species, to include disconnected sections.

First as to viability, the regulation itself explains that "a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence…" 36 C.F.R. §219.19.

The Court must determine whether the Sierra Madre range habitat must be managed to maintain a viable bighorn herd in the first place. The issue for the Court to decide hinges on the purpose of §219.19 as a whole and on how the term "planning area" is used in §219.19. The regulation mandates that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the *planning area*," and a viable population is one in which it "is *well distributed* in the

25

planning area." 36 C.F.R. §219.19 (emphasis added). Petitioners rely on this term "well distributed in the planning area" to mean the entire forest, to include the Sierra Madre range. Petitioners cite to a Ninth Circuit case in which the court there stated the National Forest Management Act imposes a substantive duty on the Forest Service "to provide species viability throughout the 'planning area,' i.e., the entire forest." *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1071 n.6 (9th Cir. 2002). The "planning area" is defined at 36 C.F.R. §219.3 as "[t]he area of the National Forest System covered by a regional guide or forest plan." Here, the Medicine Bow National Forest Revised Land and Resource Management Plan covers the Sierra Madre range where the Encampment herd is located, just as it covers the Laramie and Snowy ranges for the Laramie Peak and Douglas Creek herds respectively.

Federal Respondents on the other hand, argue the Forest Service has more discretion and flexibility to meet the needs of multiple uses, and the Forest Service satisfied §219.19 when it provided habitat "to support…a minimum number of reproductive individuals…" 36 C.F.R. §219.19. Federal Respondents argue the Chief Forester interpreted §219.19 far more narrowly than the interpretation which the Deputy Under Secretary later made. Federal Respondents argue habitat is managed to support viability with protections on the Laramie Peak herd habitat, the Douglas Creek herd habitat, and several strategies protecting lambing habitat on all three herd ranges.

The underlying purpose of §219.19 is for the viability of native and desired non-native species, which is stated in the first sentence. From there, the regulation goes on to explain what viability means and how to accomplish habitat that supports viable

populations. "In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be *well distributed so that those individuals can interact with others in the planning area.*" 36 C.F.R. §219.19. In the context of managing habitat to support viable populations, §219.19 could require the Forest Service to manage all possible habitat within the planning area to support the viability of native and desired non-native species, or it could merely require the Forest Service to manage habitat so that a minimum number of reproductive individuals may interact with others in the planning area. Accordingly, as to §219.19, the Court concludes the regulation does not convey a plain meaning and therefore is ambiguous.

## II. Whether the agency is given *Auer* deference

When a regulation is ambiguous, the Court gives controlling weight to an agency's interpretation of its own regulation absent a good reason not to do so. *Bowles v. Seminole Rock Co.,* 325 U.S. 410 (1945). An agency's interpretation of its own regulation is controlling unless that interpretation is plainly erroneous or inconsistent with the regulation. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). "[D]eference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation…" *Christopher,* 567 U.S. at 155. (citation omitted).

The Medicine Bow Regional Forester chose the preferred alternative (D-FEIS) to revise the Forest Plan which emphasized domestic sheep grazing over the Encampment River herd in the Sierra Madre range. AR 4027-28. Then, the Chief of the Forest Service, through a reviewing officer, instructed the Regional Forester to aim his management at maintaining all three bighorn herds. *Id.* at 29-100. Finally, the Deputy Under Secretary determined §219.19 does not require the Regional Forester to maintain habitat for all three herds. *Id.* at 105-10; *see also* 2012 Planning Rule, 77 Fed Reg. 21162, 21217 (April 9, 2012) (explaining the intent of the "well distributed" language and how it had been inconsistently interpreted and applied).

> In such a circumstance, *Auer* deference is "unwarranted." *Christopher,* 132 S.Ct. at 2166; *see id.* (noting that the situation "might occur" where *Auer* deference is unjustified because "the agency's interpretation conflicts with a prior interpretation"); *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (noting that "an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference' than a consistently held agency view" (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987))); *cf. Bowen,* 488 U.S. at 212–13, 109 S.Ct. 468 (noting that "[f]ar from being a reasoned and *consistent* view of the scope of [the statutory] clause," the agency's "current interpretation ... is contrary to the narrow view of that provision advocated in past cases"); *Drake,* 291 F.3d at 69 ("Where the agency's litigation position is consistent with its past statements and actions, there is good reason for the court to defer, for then the position seems 'simply to articulate an explanation of longstanding agency practice.' " (quoting *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n,* 212 F.3d 1301, 1304 (D.C.Cir.2000))).

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 731 F.3d 1106, 1139 (10th Cir. 2013) (*rev'd and remanded* for reasons relating to an applicant demonstrating a Title VII disparate treatment claim). Due to the agency's inconsistent interpretations, the Court

will not give the agency *Auer* deference, but will look instead to see whether *Skidmore*

deference is warranted. *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).


### III. Whether the agency's interpretation has the power to persuade

Under *Skidmore*, giving deference to the agency "would be proper only if the

agency has the *power to persuade,* which 'depend[s] upon the thoroughness evident in its

consideration, the validity of its reasoning, [and] its consistency with earlier and later

pronouncements.' " *Vance v. Ball State Univ.,* —— U.S. ——, 133 S.Ct. 2434, 2443 n. 4

(2013) (quoting *Skidmore,* 323 U.S. at 140); *See also United States v. Mead Corp.,* 533

U.S. 218, 226 (2001) (explaining that, under *Skidmore*, the degree of deference given

informal agency interpretations will "vary with circumstances, and courts have looked to

the degree of the agency's care, its consistency, formality, and relative expertness, and to

the persuasiveness of the agency's position.")

The Court has previously discussed how the interpretation of §219.19 has been

inconsistent. The difference in interpretation of §219.19 between the Regional Forester of

Medicine Bow National Forest, the Chief of the Forest Service, and the Deputy Under

Secretary only reflects the ambiguity of §219.19. The viability provision "ha[d] been the

subject of intense debate within and among the Forest Service, the scientific

communities, the federal judiciary, and others," and identified "a few areas of general

consensus." AR7. While the Court is not willing to give the agency considerable

deference due to inconsistent policy interpretations, consistency is not the only factor that

plays into whether the agency has the power to persuade. *See Immigration &*

29

*Naturalization Serv. V. Cardoza-Fonseca,* 480 U.S. 421, 446 n. 30 (1987) (considerably less deference afforded to inconsistent interpretation than a consistently held agency view.)

"*Skidmore* deference traditionally has been justified, at least in part, on an assumption that the agency in question has 'specialized experience and broader investigations and information available to' it than do judges." *Hydro Res., Inc. v. U.S. E.P.A.,* 608 F.3d 1131, 1146 (10th Cir. 2010) (quoting *Mead,* 533 U.S. at 234). The Regional Forester has such specialized experience, information available to him, and the administrative record reflects a thorough consideration into the matter. The Regional Forester made the determination, given all information available to him, that emphasizing domestic sheep grazing over the Encampment River herd in the Sierra Madre range, the Medicine Bow National Forest would still be able to manage the habitat of the Laramie Peak and Douglas Creek herds in order to achieve viability of bighorn sheep.

Accordingly, when considering the legal interpretations of the agency, the Court gives some deference to the agency interpretation of the regulation. The Court is persuaded by the Deputy Under Secretary's interpretation that there is no requirement that the Forest Service manage habitat so as to maintain bighorn herds, at maximum potential, across the entire Forest, at all potential habitat locations, including mountain ranges that are disjointed and distinct from one another. Although Petitioners advance a competing interpretation, it has not convinced the Court the agency's interpretation should not be entitled to deference.

But, when reviewing the agency's factual determinations the Court must ensure that the agency's determinations were not arbitrary and capricious.

## IV.  Whether the agency's decision was arbitrary and capricious

Agency action is arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem. *Wyoming v. U.S. Department of Agriculture*, 661 F.3d 1209, 1227 (10th Cir. 2011). Petitioners argue Respondents' actions was arbitrary and capricious by failing to "consider an important aspect of the problem," the agency "offered an explanation for its decision that [ran] counter to the evidence before the agency," and "the agency['s] action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bosworth,* 443 F.3d at 739.

A host of options could have been considered in the alternatives. First, the Medicine Bow National Forest Revised Land and Resource Management Plan could have considered cattle grazing for the Sierra Madre allotments that abut the bighorn sheep range. AR at 5178–95. Second, the Forest Plan could have considered using local but separate private land for grass banking agreements. *Id.* The owners of the grazing allotments could explore using nearby private lands that are separate enough from the bighorn range to sustain the Encampment River herd. Third, is the possibility of shifting these seven grazing allotments to public lands that are not within bighorn habitat. *Id.* These alternatives would allow for multiple use and no net loss of grazing allotments. All of these alternative options were in the record, most apparent in the Final Report and Recommendations from the Wyoming State-wide Bighorn/Domestic Sheep Interaction

Working Group. AR at 5178–95. However, the Regional Forester's decision was made with thorough consideration.

The Deputy Under Secretary affirmed the Chief of the Forest Service's decision "with the exception of the Chief's decision with instructions on the management of bighorn sheep and domestic sheep. On this issue, [the Deputy Under Secretary affirmed] the Regional Forester's decision." AR at 107. In looking at the viability requirement of §219.19, the Regional Forester considered the Medicine Bow National Forest as a whole, taking into account all three herds, their populations, risks to the herds, the natural disjunction of the herds, and what it would take to manage the habitat so that "at least, a minimum number of reproductive individuals" among the bighorn herds could "interact with others in the planning area." 36 C.F.R. §219.19. Respondents point out that the Regional Forester considered other factors when making his decision to adopt the preferred alternative (D-FEIS) which emphasized domestic sheep grazing over the Encampment River herd in the Sierra Madre range.

> (1) the Encampment herd was well below the 125 sheep minimum size for viability and had never thrived; (2) the Encampment herd was not a priority for the State; (3) the State was not likely to expend further resources on the Encampment herd, such as reintroducing more individuals to augment the current herd size, like it was for the other two herds; (4) the Encampment herd would "still be managed to maintain ungulate habitat," including prescribed burns, that would assist the Encampment herd with winter foraging, AR004028; (5) a need to maintain management flexibility in the event that vaccine research provided a solution; and (6) the Encampment herd was distinguished from the other two herds in its close proximity to existing domestic sheep allotments. See e.g., AR003516, AR000108.

*Fed. Resp't Br. in Opp'n to Pet'rs Opening Br.,* (ECF No. 27), p.27. Intervenors argue even with domestic sheep being emphasized in the Sierra Madre range, habitat for

bighorn sheep throughout the Medicine Bow National Forest would still be managed to achieve viability. In order to achieve viability throughout the Medicine Bow National Forest,

> the Forest Plan implemented the Laramie Peak Bighorn Sheep Habitat Management Plan. (AR 2614, 2620, 2623, 2626, 2628, 2630). In the geographic areas within and adjacent to both the Laramie Peak and the Douglas Creek Herd ranges, the Forest Plan established standards and guidelines to "[m]anage domestic sheep to provide adequate and effective separation from bighorn sheep, avoiding contact between the two." (*Id.* 2614, 2620, 2623, 2626, 2628, 2630, 2663, 2667, 2671, 2674, 2682, 2687, 2694, 2702). In the geographic areas that contained both the Douglas Creek and the Encampment River Herds, the Forest Plan provided a guideline that requires the agency to consider bighorn sheep needs when conducting vegetative treatments. (*Id.* at 2645, 2633, 2667, 2671, 2675, 2682, 2687, 2694, 2702). Finally, the Forest Plan provided measures for the Forest Service to follow in wilderness areas used by the Encampment River Herd. (*Id.* at 2645, 4028). These included the use of fire as a means to restore bighorn sheep lambing ground habitat and winter forage. (*Id.*)

*Joint Resp. Br. of Resp't-Intervenors,* ECF No. 26, p.15. The Court is persuaded by the Regional Forester's "thoroughness evident in [his] consideration, the validity of [his] reasoning," his "specialized experience and broader investigations and information available to [him]." *Skidmore, 323 U.S. at 140; Mead,* 533 U.S. at 234. Substantial evidence in the administrative record supports the Regional Forester's decision. Based on the Court's review of the Regional Forester's decision in determining habitat in the Medicine Bow National Forest would be managed to achieve viability of bighorn sheep, Petitioner has not shown the Regional Forester acted arbitrarily or capriciously.

## CONCLUSION

Biodiversity possesses standing to challenge this agency action. The Court finds the regulation, 36 C.F.R. §219.19, does not convey a plain meaning and therefore is ambiguous. Due to conflicting prior interpretations of §219.19, the Court does not afford the agency *Auer* deference. The Court gives the agency *Skidmore* deference. Accordingly, when considering the legal interpretations of the agency, the Court gives some deference to the agency interpretation of the regulation. The Court is persuaded by the Deputy Under Secretary's interpretation of §219.19. But, when reviewing the agency's factual determinations the Court must ensure that the agency's determinations were not arbitrary and capricious. Based on the Court's review of the Regional Forester's decision, Petitioner has not shown the Regional Forester acted arbitrarily or capriciously. As such, the Court upholds the Deputy Under Secretary's Discretionary Review Decision upholding the Regional Forester's decision to adopt the 2003 Revised Forest Plan.

For the foregoing reasons, it is hereby

**ORDERED** that the *Amended Petition for Judicial Review* (ECF No. 17) shall be, and is, **DENIED.** The Deputy Under Secretary's decision to uphold the Medicine Bow National Forest Revised Land and Resource Management Plan concerning the issue of bighorn sheep viability is hereby **AFFIRMED.**

Dated this _31st_ day of July, 2017

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE